MOLLER (HICKS v.). See Case No. 6,461.

MOLLER (UNITED STATES v.). See Cases Nos. 15,793 and 15,794.

MOLLIE. The (UNITED STATES v.). See Case No. 15,795.

## Case No. 9,701.

### The MOLLIE MOHLER.

[2 Biss. 505;[1] 4 Am. Law T. Rep. U. S. Cts. 145.]

*District Court, E. D. Wisconsin. April, 1871.*[2]

TOWAGE — LIABILITY FOR NEGLIGENCE—RUNNING BRIDGE—BILL OF LADING—DANGERS OF NAVIGATION—BURDEN OF PROOF.

1. A steamboat with loaded barges in tow descending the Mississippi river about night-fall, the general bent of the weather being tempestuous, is in fault for running bridge piers; and the fact that the wrecking of a barge by collision with a pier was caused by a gust of wind does not relieve the liability.

2. The carrier, in order to avail himself of the exceptions of "dangers of navigation," must show due diligence and proper care to avoid the accident, and that it was unavoidable.

3. The burden of proof for this purpose is upon the carrier.

This was a libel by the Home Insurance Company, insurer, against the steamboat Mollie Mohler, to recover the value of 700 bags of wheat, shipped on the 12th day of May, 1866, at Mankato on the Minnesota river, on the barge Erickson, in tow of the steamer, to be delivered at St. Paul in good order, "dangers of fire and navigation only excepted." The wheat, having been damaged and lost to the owner, was surrendered to the company. Negligence, carelessness and unskillfulness of the master and crew of the boat were alleged in the libel, and denied in the answer.

Emmons & Van Dyke, for libellant.
J. W. & A. L. Cary, for respondent.

MILLER, District Judge. It is confessed in the answer that the barge in tow of the steamboat was sunk in the Mississippi river, whereby the wheat was lost to its owner. And it is alleged in the answer, that the steamboat and barge proceeded on their voyage without accident until they reached the

---

[1] [Reported by Josiah H. Bissell, Esq., and here reprinted by permission.]
[2] [Affirmed by circuit court; case unreported. Decree of circuit court affirmed by supreme court in 21 Wall. (88 U. S.) 230.]

port of St. Peter, where they took in tow another barge called Eclipse, loaded with wheat, and then proceeded to the port of Belle Plains, where they took in tow another small barge called the Banty, also loaded with wheat. They proceeded without interruption or accident until on the 14th May, at about eight o'clock in the evening, when they reached a point in the Mississippi river about two miles above St. Paul, where there were several stone piers erected for the purpose of a railroad bridge across said river. The answer further states that just before they reached the piers, and while proceeding with due care and caution, the steamboat and barges being in the widest and best channel of the river, and the master and his mariners and servants being respectively in their proper places, a strong gust or gale of wind coming from a southerly direction suddenly arose and struck the steamboat and barges with great force and violence, so much so as to change their course, notwithstanding the best efforts of the master and mariners to keep them in their course. The wind, with the current of the river, which sets towards the middle of the piers, drove the steamboat and barges towards the middle pier, and in spite of the best efforts of the master and crew, the barge Eclipse struck the middle pier with great violence, which stove in a hole in its side, by reason whereof it filled with water and sunk immediately; that the jar caused by the striking of the barge Eclipse against the pier, and the consequent sudden stoppage of the steamboat and barges and the swift current of the river, caused the barge Erickson to career and fill with water, and sink.

It appears from the evidence, that the barge Eclipse was on the larboard side of the steamboat, the Erickson on the starboard side of the boat, and the Banty also on the starboard side, at the stern of the Erickson, following right after. The steamboat was 125 feet in length, 23 feet beam, had two engines and two boilers and stern wheel; and was staunch and able to handle the barges. The barges were not overloaded, were sufficient for the trade, and in good handling order. The boat and barges arrived at Mendota, the junction of the Minnesota and Mississippi rivers, about an hour before sundown on the 14th of May. The wind blowing hard that afternoon they remained at that port for it to lull, so that they might run the bridge piers at that place.

The wind having lulled so as to enable them to run those piers, they put out for St. Paul about sundown. The wind being south-easterly on the Mississippi river, they passed down on the right hand side of the river for about five miles, under the lee of continuous high bluffs, when they crossed over to the other side about the ferry landing, half a mile above the bridge piers, where the accident occurred, and there they encountered a high wind blowing in squalls or gusts. The water clear across the river was ten feet deep. They could have landed between the ferry and the cove, more than a quarter of a mile above the piers. There was no difficulty in making a landing near the ferry. The wind was blowing hard in gusts or squalls from the south-east, and continued so until the collision took place. They made no effort to land, but proceeded towards the piers, claiming the privilege of a descending boat to pass an ascending boat on the starboard side, in her efforts to run the piers. They made no effort to back, or head to the shore, doing nothing but to run the piers against the gusts or squalls of wind, stricking broad-side, about eight o'clock at night.

The distance between the piers was 165 feet and the breadth of the steamboat and tow was 65 feet. There cannot be fault found in the attempt to run the piers within this space, nor in the management of the boat at the time, nor with the conduct of the master and crew, as they all seem to have been at their respective posts of duty. The fault lies in not making a landing on discovering the boisterous state of the weather while crossing the river to the left hand bank, where there were two landing places, or putting back. The event cannot sanction the excuse of a sudden gust of wind as the cause of the collision. The master was admonished half a mile above, to secure his boat and tow by turning back or effecting a landing, and not to attempt running the piers at nightfall, while the general bent of the weather was tempestuous and boisterous.

It is incumbent on the master, in order to bring himself within the exception in the bill of lading, "of dangers of navigation," to prove that due diligence and proper skill were used to avoid the accident, and that it was unavoidable. The carrier must satisfy the court that there was no default on his part, and that every reasonable effort was made to avoid the accident. The burden of proof is on him to bring himself within the exception. When a collision or loss occurs, in the absence of fault on the part of the carrier, under circumstances beyond his control from vis major, as from storm, or waves, or reflex of the tide, or lightning, he is not held liable even on a clean bill of lading. In the case of The Lady Pike [Case No. 7,985], the boat towing three loaded barges down stream, on approaching the same bridge piers as in this case, too closely to back or stop, one of the barges was driven against a pier by a sudden and unanticipated gust of wind. I decreed that the carrier was not liable for the loss of the cargo of the damaged barge. In that case the accident could not be avoided. In this case the master was admonished in time by the boisterous and tempestuous state of the weather not to run the piers, but to make a landing or put back, either of which he could have done nearly half a mile above the piers. In the opinion in the case of The Lady Pike [supra], I remark: "If the piers

had been approached under a high wind, the boat should be condemned for unskillfulness of the officers; but there was a calm until the approach to the piers was too close to admit of avoiding the effect of an unanticipated and sudden gust of wind." See, also, Amies v. Stevens, 1 Strange, 128. The collision with the pier was the result of recklessness on the part of the master, and the decree must be for the libellant.

[NOTE. The claimants of the Mollie Mohler, upon appeal, took the case into the circuit court, where the decree of this court was affirmed. Case unreported. Upon further appeal the case was taken to the supreme court, where the decree of the circuit court was affirmed. 21 Wall. (88 U. S.) 230.]